MARC E. JOHNSON, Judge.
| ¡..Defendant, Francisco Hernandez, appeals his conviction for aggravated rape from the 24th Judicial District Court, Division “H”. For the following reasons, we affirm Defendant’s conviction and sentence.
FACTS AND PROCEDURAL HISTORY
On September 11, 2008, a Jefferson Parish Grand Jury returned an indictment charging Defendant with one count of aggravated rape upon a known juvenile, A.C.[1], (D.O.B.1/17/2000) on or between November 1, 2005 and October 21, 2006, in violation of La. R.S. 14:42. Defendant was arraigned and pleaded not guilty to the charge on September 19, 2008. On June *346 10, 2013, Defendant’s trial commenced before a twelve-person jury.
At trial, R.C., the father of the victim, A.C., testified that A.C. was the only child from his marriage to J.C. At the time of trial, A.C. was 13 years old, immediately following Hurricane Katrina, R.C. and J.C. were separated. A.C. lived with J.C. during the week, and R.C. picked A.C. up on weekends. At that time, J.C. was living with her boyfriend and two other males, including Defendant. R.C. testified that in late October of 2006, while he was in his FEMA trailer with A.C., A.C. said “he had something to tell [R.C.] and he confessed to [R.C.] that he was sexually abused.” R.C. testified that A.C. “didn’t say those words,” but he said that “Jimmy and Chico put their penis[es] in his mouth.”[2] R.C. testified he was the first person A.C. told, and that A.C. did not tell his mother.
R.C. testified that he called J.C. to discuss what A.C. recounted to him. R.C. testified that A.C. told him that Jimmy “put his penis in his mouth” on more than one occasion and that Defendant also did it, and they “had him in the bedroom and they locked the door and he couldn’t get out the room.” R.C. testified that A.C. was five years old when he told him that information. He denied interrogating his son and denied spending days teaching A.C. what to say happened to him at the hands of Defendant. R.C. testified that AC.’s story remained consistent throughout the years and did not change.
R.C. testified that he waited several days to report the "accusations of abuse because he wanted to get the truth out of A.C. first. R.C. testified he did not notice any mood swings or strange behavior in the month prior to the accusation. A.C. disclosed to R.C. that he was “being raped by two men for at least a month.” R.C. testified that he did not notice A.C. was suffering any physical discomfort, and he did not notice any swelling, bruising, or blood. R.C. testified that he offered A.C. a trip to Disney World if he would tell the truth. R.C. testified that right before his son told him what Defendant did to him, R.C. was eating a banana, and he “guess[ed] it reminded him of what happened to him.” R.C. testified that |4A.C. did not want to go back to his mother’s home, and A.C. said he was scared and was threatened, which is why he never told anyone.
A.C. testified that he was 13 years old at the time of trial. He testified that when he was five years old, someone touched him or sexually abused him. A.C. testified that “[Defendant], he put his penis in my butt when I was five years old and he made me like touch his penis and stuff, and that was pretty much it.” He testified that Defendant made him touch Defendant’s penis with his hands and his mouth. He said one time he told his mom what happened, but “she .didn’t believe [him].” A.C. also told his dad what happened when no one was around and he felt safe. A.C. testified that Defendant and Jimmy threatened him and said they would beat him up if he told anyone. A.C. testified that Defendant made him touch his penis two times and Defendant also put his penis in his “butt” two times. A.C. testified he had no doubts that Defendant was “the man who stuck his penis in [A.C.’s] butt.”
The Child Advocacy Center (“CAC”) video of the interview of A.C. was then played for the jury. During the interview, A.C. said he was in his uncle’s room and “[Defendant] made me suck his weinee one *347 time.” He said Jimmy made him do it first. He said both Jimmy and Chico “made him suck his weinee.” A.C. said Chico bit his penis and that Chico put his “pee” in A.C.’s butt. A.C. said Defendant pulled A.C.’s underwear'down, but not his shirt, and then bit AC.’s “pee.” A.C. said all these things happened on “one day” and that Defendant also hit him. He said these things happened in A.C.’s mom’s room, and Defendant had locked the door. A.C. said he first told his dad, R.C., what had happened.
A.C. testified at trial that Defendant also hit him and bit his penis, and that this happened one time. A.C. testified he was telling the truth. A.C. testified he did not remember being bruised, but he knew that he said he was bruised all over |Khis body during the CAC interview. A.C. testified that on August 17, 2012, he told the “DA’s office” that the anal rape happened between three and four times, but on November 21, 2012, he told the “DA’s office” the anal rape only happened one time and oral sexual abuse occurred two to three times. He testified he changed the number of times the acts occurred because he “remembered what really happened.” A.C. testified that, at the time of trial, he remembered what really happened, and that there was one occurrence of anal rape and three occurrences of “oral sexual abuse.” A.C. testified that when Defendant “put his penis in [A.C.’s] butt,” Defendant made A.C. “get on top of it and jump up and down.”
J.C., A.C.’s mother, testified through an interpreter that R.C. hates her boyfriend, Pablo.[3] J.C. testified that after Hurricane Katrina, she was living with Pablo, Defendant, Jimmy and J.H.[4] She testified that in October of 2006, she learned “something unusual” regarding her son from A.C.’s father. She was surprised about what she learned, and she went to the police with R.C. She testified that R.C. translated certain words on her behalf to the police. She continued to live with Defendant after learning about what happened with A.C. because she did not have anywhere to go, but she was not happy about that. She testified that she never saw any -type of beatings or bruising, and if A.C. had any bruises on his body, she would have noticed them. She never noticed any mood swings from A.C. in the month prior to “this incident” and A.C. never complained to her of any discomfort “to his behind.”
J.C. testified that both of her sons used to play with Defendant and Jimmy; but when Defendant got home from work, he would be tired and did not always want to play with the children. She testified that there was an incident where A.C.’s pants were pulled down by Defendant and Jimmy, and A.C. immediately | (¡complained to her. She characterized it as a game and told Pablo that she did not like that game. J.C. said that was the first time either one of her children made a complaint about Defendant or Jimmy. J.C. testified that she “didn’t believe it, especially of his brother,” referring to Pablo’s brother, Defendant, as she liked Defendant a lot.
J.H., A.C.’s half-brother, testified that he was 18 years old at the time of trial. He testified that Defendant and Jimmy undressed A.C. in front of him one time. J.H. testified that Jimmy and Defendant “just took [A.C.’s] clothes off, they tried to take my clothes off.” J.H. testified that he was able to get away and went into the living room. J.H. tried to get back into the room after a few minutes to see what was going on, but Jimmy and Defendant had locked the door. He testified that no *348 one else was home, and he did not tell anyone what happened. When A.C. came out of the room, “he came out like normal” and “like nothing happened.” When A.C. came out of the room, he was naked, with his underwear off. J.H. did not tell anyone because at first he thought it was a joke, and they were playing around, but “once they locked themselves in the room with [his] brother, that’s when it got pretty serious but [J.H.] never said anything.” J.H. testified he never heard A.C. say he was raped in that room or beaten in that room. J.H. testified that he himself was never sexually abused in that apartment, and no one ever attempted to sexually abuse him in that apartment. J.H. testified that he never saw A.C.’s body covered with bruises and that he himself had never been bruised.
Detective Donald Zanotelli with the Jefferson Parish Sheriffs Office testified that on October 25, 2006, he responded to a walk-in sexual complaint where R.C., J.C., and the victim, A.C., were present. He testified that he spoke with A.C. and that A.C disclosed sexual abuse. At some point, Detective Zanotelli developed Defendant and Walter Amaderus, also known as Jimmy, as possible |7suspects. Detective Zanotelli testified that on October 25, 2006, he communicated to Defendant, through a deputy who spoke some Spanish (albeit not fluently), that Defendant was to remain at the residence until a translator was located. During the investigation, he authored a warrant for the arrest of Defendant. Detective Zanotelli testified that when he attempted to execute the warrant, he learned Defendant was no longer in the state and had gone to Texas. On approximately May 13, 2008, he located Defendant in Alabama, about 1 ⅜ years after he authored the warrant. Detective Zanotelli testified that R.C., J.C., and A.C. came into the office three days after A.C. reported the abuse to his father.
Detective Zanotelli testified that for the initial report, A.C. did not disclose any information regarding anal intercourse; however, that information was provided during the CAC interview. He testified that it never came to his attention that after he instructed Defendant not to leave his apartment on October 25, 2006, Defendant stayed in that apartment until late December and did not leave. It did not cause Detective Zanotelli concern that A.C.’s mother, J.C., remained living with Defendant for two months after he was accused of raping A.C.
Terry Brignac, who was retired at the time of trial, was previously employed by the Louisiana Department of Social Services’ Child Protection Division as an investigator. He testified that he was a “truth seeker” and would try to determine whether or not he believed the allegations of abuse or neglect were substantiated. In November of 2006, he interviewed A.C. and some of his family members regarding an allegation of sexual abuse. Mr. Brignac interviewed A.C. alone at his father’s FEMA trailer and also had the opportunity to interview A.C.’s parents and J.H. Mr. Brignac testified that the findings were that the child had been molested and sexually abused. He testified further that the findings' were “invalid on the parents in that [he] did not feel they were culpable at the time,” and they took | ^appropriate actions to protect A.C. when they learned about the abuse. He was unable to interview Defendant, since Defendant could not be located.
It was stipulated that Dr. Scott Benton was an expert in the field of general pediatrics, forensic pediatrics, and child sexual abuse. Dr. Benton testified he did not personally examine or interview A.C., but he reviewed A.C.’s medical records. Dr. Jeff Quo was the individual to conduct the *349 interview and examination of A.C., and Dr. Benton testified he was Dr. Quo’s fellowship supervisor. Dr. Benton supervised Dr. Quo with regard to A.C. and reviewed and signed off on Dr. Quo’s work.[5] Dr. Benton testified that the findings related to A.C. were normal, which neither confirmed nor refuted that the sexual abuse took place. Dr. Benton testified he would not be surprised to learn that A.C. made additional disclosures wherein there was an inconsistency as to the number of times the abuse occurred because at six years old, “a numerical counting is [developmentally] challenged.” Dr. Benton testified that children can be influenced by subtle suggestions, expectations, and stereotypes, as well as by an interviewer who is biased. Dr. Benton testified that in the interview with Dr. Quo, there was a child with a Spanish background and an interviewer who was Chinese with English as a secondary language, so “there [was] some difficulty.” Dr. Benton further testified that when A.C. was questioned by Dr. Quo concerning whether his pants were on or off during the abuse, there was a “constant sequence of misunderstandings going on in that interlude about whether pants or clothing [were] on or off.” Dr. Benton testified he did not find any physical evidence that was supportive of an anal rape.
Pablo Hernandez, J.C.’s boyfriend and Defendant’s brother, testified that he was unaware of any criminal record of Defendant. Pablo testified that R.C. would send J.C. and J.H. to threaten him, and they would say R.C. was going to call | ¡Immigration on him and that he would beat up or shoot Pablo. Pablo testified that those threats lasted for about one year, and he did not believe R.C. until J.C. brought him a revolver “to show [him] that it was true.” Pablo testified he did not get along with A.C., as A.C. did not like him because “his mother left his father.” Pablo testified that Defendant worked construction every day except for Sunday, and that A.C. was there only during the weekends. In the three months prior to the police coming out, Pablo testified that there were no problems at the house, everyone got along fíne, and A.C. did not show any fear of any of the men in the apartment. There was one incident that A.C. was not pleased with, which was when Defendant pulled down A.C.’s shorts. Pablo testified that he was present diming that incident along with J.C., J.H., A.C., and Defendant. Pablo testified that Defendant pulled down A.C.’s shorts because “[A.C.] was playing and he wouldn’t stop playing, and so to stop him, [Defendant] pulled down [A.C.’s] shorts.” When that occurred, everyone started laughing because A.C. got “very mad.” Pablo testified that when Defendant pulled down A.C.’s shorts, there were boxers underneath and no nudity was revealed of the child. Pablo also testified that Defendant was never left to care for A.C. alone, and he never noticed if anyone took A.C. and locked him. into a room for “20 minutes or so.” Pablo stated that Defendant stayed in the apartment for 40 days because the police ordered him to stay there.
Defendant testified and offered his version of the events. He said he never molested any child. He further testified that except for the instant charge, he had never been arrested in his life. Defendant admitted that he “was playing with the little boy and [he] pulled down his pants” and “everyone” was present at the time. Defendant testified that during that incident, he did not remove all of A.C.’s *350 clothes and A.C. was not naked. A.C. wanted to play, but Defendant did not want |into play anymore. Defendant denied ever touching A.C. inappropriately or locking A.C. inside his bedroom. He denied performing oral sex on A.C. or that A.C. was “jump[ing] and bounding] on [his] penis.” He further denied beating A.C. or causing bruises to A.C.’s body. Defendant testified that if he wanted to flee and hide from police, he could have gone back to Honduras where his mother and daughter lived, which would have been easy and cheap to do.
On June 13, 2013, the jury returned a verdict of guilty as charged. Defendant filed a motion for a new trial pursuant to La. C.Cr.P. art. 851 on August 5, 2013. On August 16, 2013, Defendant filed a post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. The motions were denied on August 23, 2013, and Defendant was sentenced to life imprisonment at hard labor, to be served without benefit of parole, probation, or suspension of sentence. Defendant filed a “Notice of Appeal” on August 28, 2013 and a “Motion and Order for Appeal” on June 3, 2014. Defendant’s appeal was granted on June 9, 2014, and the instant appeal followed.
ASSIGNMENTS OF ERROR
On appeal, Defendant alleges: 1) there was insufficient evidence to support the conviction for aggravated rape; 2) the trial court erred in refusing to grant a new trial; and 3) the trial court erred in admitting and publishing Dr. Quo’s interview of the victim to the jury.
LAW AND ANALYSIS

Sufficiency of Evidence

Defendant argues that neither the acts nor the circumstances during which the acts allegedly occurred have any basis in evidence, and in fact, the evidence adduced at trial established that the allegations were false. Defendant offers several points in support of his argument, which include: A.C. was never left alone Nwith Defendant; A.C.’s accusations that he was beaten and bruised have no basis in fact; there were inconsistencies with regards to who was in the room when the acts allegedly occurred; and A.C. had many opportunities to report the abuse to his father before he actually did. Defendant argues that the number and severity of contradictions about the abuse are confounding and a rational jury did not intelligently consider this case.
The State argues that they presented evidence of each element of the offense, and the jury’s decision to believe the victim was not irrational.
The appropriate standard of review for determining the sufficiency of the evidence was established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard for appellate review is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson, 443 U.S. at 319, 99 S.Ct. at 2789. See also State v. Mussall, 523 So.2d 1305 (La.1988); State v. Williams, 98-1146 (La. App. 5 Cir. 6/1/99); 738 So.2d 640, 648, writ denied, 99-1984 (La.1/7/00); 752 So.2d 176. Under the Jackson standard, a “review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.” Jackson, 443 U.S. at 319, 99 S.Ct. at 2789; State v. Le, 13-314 (La.App. 5 Cir. 12/12/13); 131 So.3d 306, 312; Williams, 738 So.2d at 648.
*351 It is not the function of the appellate court to assess credibility or reweigh the evidence; rather, a reviewing court must consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. Williams, 738 So.2d at 648. See also State v. Juluke, 98-0341 (La.1/8/99); 725 So.2d 1291. When the trier of fact is faced with conflicting | ^testimony, the weight of the testimony lays solely with the jury or judge, who may accept or reject, in whole or in part, the testimony of any witness. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05); 904 So.2d 830, 833; State v. Bradley, 03-384 (La.App. 5 Cir. 9/16/03); 858 So.2d 80, 84, writ denied, 03-2745 (La.2/13/04); 867 So.2d 688. Indeed, a reviewing court errs by substituting its own appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See State v. Calloway, 07-2306 (La.1/21/09); 1 So.3d 417, 418.
Evidence is either direct or circumstantial. “Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.” State v. Shapiro, 431 So.2d 372, 378 (La.1982); Williams, 904 So.2d at 833. In instances involving circumstantial evidence, La. R.S. 15:438 dictates that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” Williams, 904 So.2d at 833. In State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83, the Louisiana Supreme Court declared:
On appeal, the reviewing court “does not determine whether another possible hypothesis suggested by a the Defendant could afford an exculpatory explanation of the events.” ... Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt....
(Emphasis in the original). See also Williams, 904 So.2d at 833. Defendant was convicted of aggravated rape upon a known juvenile under the age of thirteen, a violation of La. R.S. 14:42. Aggravated rape is defined, in pertinent part, as “a rape committed ... where the anal, oral, or vaginal sexual | ^intercourse is deemed to be without lawful consent of the victim because it is committed ... [w]hen the victim is under the age of thirteen years.” La. R.S. 14:42(A)(4). When the rape involves vaginal or anal intercourse, any sexual penetration, however slight, is sufficient to complete the crime. La. R.S. 14:41(B). Oral sexual intercourse is defined in pertinent part as the “touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.” La. R.S. 14:41(0(1).
 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’ testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion. State v. Robinson, 02-1869 (La.4/14/04); 874 So.2d 66, 79, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004); State v. Perkins, 11-162 (La.App. 5 Cir. 12/28/11); 83 So.3d 250, 255. With sexual offenses, the victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. Perkins, 83 So.3d at *352 255; State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99); 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00); 765 So.2d 1062, and 00-0150 (La.6/30/00); 765 So.2d 1066.
Convictions of aggravated rape have been upheld in the absence of medical evidence. In State v. Roca, 03-1076 (La.App. 5 Cir. 1/13/04); 866 So.2d 867, 875-76, writ denied, 04-0583 (La.7/2/04); 877 So.2d 143, this Court affirmed the defendant’s convictions of aggravated rape and molestation of a juvenile despite the lack of medical evidence when the victim testified at trial that the defendant forced her to engage in various sexual acts, including the fondling of genitals, sexual intercourse, and oral copulation.
In State v. Alfaro, 13-39 (La.App. 5 Cir. 10/30/13); 128 So.3d 515, 524, writ denied, 13-93 (La.5/16/14); 139 So.3d 1024, there was no medical evidence introduced at trial from the defendant’s sexual abuse of the juvenile victim. The jury viewed a videotape of the victim’s CAC interview where she described years of sexual abuse by the defendant and that was corroborated by the testimony of other individuals. Id., 128 So.3d at 525. At trial, however, the victim testified that her previous allegations were false, and the defendant did not sexually abuse her. Id., 128 So.3d at 524. When the jury returned a guilty verdict, they obviously discredited the victim’s trial testimony, opting to believe her CAC interview, and this Court found that discrediting a witness’s testimony was within the jury’s sound discretion. Id. There, the jury also was assisted by expert testimony in better understanding a child-witness. Id., 128 So.3d at 525. The jury evidently chose to discredit the trial testimony of the defendant, and this Court found a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Id.
Here, the jury was confronted with testimony from the victim, the victim’s family, experts, detectives, Defendant’s brother, and from Defendant himself. The jury heard the victim testify that “[Defendant], he put his penis in my butt when I was five years old and he made me like touch his penis and stuff, and that was pretty much it.” He testified that Defendant made him touch Defendant’s penis with his hands and his mouth. A.C. testified that Defendant threatened him and said he would beat him up if he told anyone. A.C. testified he had no doubts that Defendant was “the man who stuck his penis in [A.C.’s] butt.” During A.C.’s CAC interview, which was viewed by the jury, A.C. said Defendant “made him suck his weinee.” A.C. further stated that Defendant bit his penis, and that Defendant put his “pee” in A.C.’s “butt.”
| ^Defendant also had the opportunity to offer his testimony to the jury. The jury heard Defendant deny ever touching A.C. inappropriately or locking A.C. inside his bedroom. He denied beating A.C., performing oral sex on A.C., or that A.C. was “jump[ing] and bounc[ing] on [his] penis.” He expressed how if he wanted to flee the country, it would have been “easy” and “cheap” to go back to Honduras. The jury also heard about the alleged animosity between Defendant and A.C.’s father.
In this case, presented with conflicting testimony, the jury evidently chose to believe A.C. and his family, rather than Defendant. The jurors were provided testimony from both sides and accepted the selected parts of the victim’s testimony, the victim’s families’ testimonies, and the CAC interview, as true. Similar to Roca and Alfaro, swpra, we find that the jury observed multiple witnesses testify and opted to allocate more weight to the child’s version of events; thus, his testimony should not be second-guessed. According *353 ly, we find that AC.’s testimony is enough to sustain Defendant’s conviction. Therefore, we find that viewing the evidence in a light most favorable to the State, the evidence presented was sufficient to convict Defendant (D.O.B.02/18/1982) of aggravated rape upon a known juvenile under the age of thirteen (D.O.B.1/17/2000).[6]

Denial of Motion for New Trial

Defendant argues that the trial court erroneously denied his motion for new trial because three State prosecutors made references to matters that attacked defense counsel’s honesty, trustworthiness, and credibility within the earshot of the jury; and thus, his due process rights were violated by said prejudicial evidence being considered during jury deliberations. Defendant maintains that when a discussion was held at the bench regarding defense counsel’s ability to speak |1fiSpanish, the State made no effort to conceal its comments from the jury concerning those arguments.[7] Defendant further argues that during closing arguments, the State again discussed defense counsel’s alleged dishonesty within earshot of the jury. Defendant claims that jurors did overhear the discussions by prosecutors that questioned defense counsel’s honesty, and that the jurors deliberated on these matters, even though they were not admissible in evidence.[8] Defendant further argues that the trial court erred in excluding affidavits from three jurors from consideration and for denying his request for an evidentiary hearing.
The State argues that Defendant’s argument concerning defense counsel’s ability to speak Spanish was not preserved for review because, although defense counsel did object initially when the stipulation regarding his ability to speak Spanish was proposed, he did not articulate the basis for his objection or request a form of relief. The State argues that while defense counsel raised the matter in his motion for a new trial, objecting three weeks after the verdict does not satisfy the “contemporaneous objection” as set forth in La. C.Cr.P. art. 841(A).
The State further argues that “outside influence” and “extraneous prejudicial information” refers to factors “originating outside of normal courtroom proceedings[,]” and that the law is overwhelmingly clear that the court may not consider evidence of the jurors’ deliberations; and therefore, the trial court properly denied Defendant’s motion for a new trial. The State posits that Defendant was not denied a fair trial as it is generally understood that inevitably, the jury will hear remarks; but here, the jury was instructed to “determine the facts only from the evidence presented.”
117Subsequent to the jury verdict but prior to Defendant’s motion for new trial and post-verdict judgment of acquittal, Defendant requested that the trial court allow an evidentiary hearing, and he said he had jurors willing to testify. Defendant attached affidavits of the three jurors[9] in *354 conjunction with the three subpoena duces tecums of those jurors. During the hearing on the State’s motion to quash the subpoena duces tecum requested by defense counsel, Defendant argued that what he alleged the jurors overheard and deliberated upon was not the normal trial process. He argued bench conferences are meant to be private and if jurors overhear those matters, it influences their verdicts and that it is not a normal courtroom activity. The State argued to the contrary, stating that bench conferences are an ordinary part of the proceedings, and because “it’s a small courtroom, sometimes jurors hear stuff’ and that is why the judge instructs the jury prior to deliberations.
The trial judge considered the jurors’ affidavits submitted by defense counsel and found that although they were well-pleaded, “the substance of what the jurors would testify [did] not amount to those matters that would be an outside influence.” The trial judge found that comments by counsel for the State at the bench that defense counsel spoke Spanish and the “under-the-breath type of comments” by State’s counsel during closing arguments were “not extraneous outside influence” and were normally done in the course of a trial. Moreover, the trial judge found that there were no allegations of. juror misconduct that violated | ^Defendant’s constitutional rights. Consequently, the trial judge granted the State’s motion to quash.
Defendant argues the State attacked defense counsel’s integrity by informing the court of its intent to advise the jury that defense counsel could speak Spanish, and when a bench conference was held, the State made no effort to conceal its comments from the jury concerning that issue. At the time the State offered a stipulation that defense counsel could speak Spanish, defense counsel did object, and requested to approach the bench. During the bench conference, defense counsel requested that the prosecutors “speak quietly.” After the bench conference, the State withdrew the stipulation as the issue was “cleared” up. Shortly thereafter, the State offered stipulation that defense counsel’s Spanish was “not good.” We find that while defense counsel objected to the offered stipulation that he could speak Spanish, “telling the prosecutors to speak quietly” was not a specific objection to the jury overhearing the State attack defense counsel’s “honesty, trustworthiness and credibility.” No specific objection to the jury hearing this information was raised until after the verdict, in his motion for new trial.
In Defendant’s memorandum for his motion for new trial, he stated,
On at least 2 and perhaps 3 occasions, the state’s comments at the bench were interrupted by both attorneys for the [Defendant by ‘shushing’ them, believing their comments could be overheard by jurors. What was not apparent was whether jurors had in fact heard any of the comments at the bench. Thus, attorneys for the defense chose not to ask for an admonition nor for a mistrial, for those matters, being that they did not *355 want to bring attention to arguments made by the State that were never admitted into evidence.
Consequently, Defendant acknowledges he did not request an admonition or a mistrial at the time the incidents occurred.
|¡ ¡¡Because Defendant failed to lodge a contemporaneous objection on this ground during the trial as required by La. C.Cr.P. art. 841, he is generally precluded from raising this issue on appeal. State v. Richthofen, 01-500 (La.App. 5 Cir. 11/27/01); 803 So.2d 171, 191. The purpose of the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem and prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. Id. However, whether a defendant’s motion for new trial preserved a particular issue for appellate review is not settled law. See State v. Sykes, 03-397 (La.App. 3 Cir. 10/8/03); 857 So.2d 638. This Court has previously reviewed an issue raised in a motion for new trial that was not been preserved via trial through an objection. See Richthofen, supra. Thus, we will address the merits of Defendant’s assignment of error.
A defendant’s constitutional due process right of fair trial by an impartial jury may be violated if the trial jurors are subjected to influences which cause their verdict to be influenced by circumstances other than the evidence developed at trial. Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); State v. Marchand, 362 So.2d 1090, 1092-93 (La.1978). In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the “evidence developed” against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant’s right of confrontation, of cross-examination, and of counsel. Turner, 379 U.S. at 473, 85 S.Ct. at 550. .
Initially in any trial, there is a presumption of jury impartiality. United States v. Winkle, 587 F.2d 705, 714 (5th Cir.1979), cert denied, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); State v. Bibb, 92-998 (La.App. 5 Cir. 11/10/93); | 20626 So.2d 913, 922, writ denied, 93-3127 (La.9/16/94); 642 So.2d 188. However, any unauthorized communication, contact, or tampering, directly or indirectly, made by a non-juror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. State v. Videau, 04-923 (La.App. 5 Cir. 3/1/05); 900 So.2d 855, 860, writ denied, 05-0841, 918 So.2d 1037 (La.1/9/06); Bibb, 626 So.2d at 922. The presumption is not conclusive, but the burden rests heavily upon the State to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. See Videau, supra; State v. Collins, 02-546 (La.App. 5 Cir. 11/26/02); 833 So.2d 476, 478, writ denied, 03-0059 (La.10/3/03); 855 So.2d 307. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury’s deliberations. Bibb, supra. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the State to show that the influence demonstrated was not prejudicial. State v. Sinegal, 393 So.2d 684, 687 (La.1981); Bibb, supra.
La. C.E. art. 606(B) provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not *356 testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury’s attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
(Emphasis added).
|s1The prohibition provided in La. C.E. art. 606(B) is intended to preserve the confidentiality and finality of jury verdicts and the confidentiality of the jurors’ discussions. Videau, 900 So.2d at 863. The prohibition against jury testimony is not absolute, however, and must yield to a substantial showing that the defendant was deprived of his constitutional rights. Id. An evidentiary hearing at which jurors shall testify is required when there are well-pleaded allegations of prejudicial juror misconduct violating the defendant’s constitutional rights. Id. A juror should not consider facts relating to the case unless such facts were introduced at trial under both constitutional and legal safeguards. State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05); 917 So.2d 583, 596, writ denied, 06-0757 (La.12/15/06); 944 So.2d 1277; State v. Johnson, 34,902 (La.App. 2 Cir. 9/26/01); 796 So.2d 201, 211, writ denied, 03-2631 (La.11/8/04); 885 So.2d 1124.
Therefore, the question before this Court is whether the remarks and comments made by the State within earshot of the jury were either outside influences or extraneous prejudicial information. After review, we find, as the trial judge did, that Defendant failed to allege juror misconduct that violated Defendant’s constitutional rights, and the comments at the bench conference and during closing arguments were “not extraneous outside influence” and were normally done in the courtroom during a trial. Thus, under La. C.E.art. 606(B), the jurors were properly prevented from testifying at Defendant’s requested evidentiary hearing.
An “outside influence” refers to a factor originating outside of normal courtroom proceedings which influences jury deliberations, such as a statement made by a bailiff to the jury, the introduction of a prejudicial newspaper account into the jury room, or a threat to the safety of a member of the juror’s family. United State v. Jones, 132 F.3d 232, 245-46 (5th Cir.1998), cert. granted in part | mon other grounds, Jones v. Unites States, 525 U.S. 809, 119 S.Ct. 39, 142 L.Ed.2d 31 (1998), affirmed, Jones v. U.S., 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); Peveto v. Sears, Roebuck. & Co., 807 F.2d 486, 489 (5th Cir.1987).
In State v. Eskano, 00-101 (La.App. 5 Cir. 1/30/01); 779 So.2d 148, the defendant argued the prosecutor made improper and prejudicial remarks about defense counsel. This Court noted it was the trial judge who had conducted the trial, heard the remarks, and “stood in the best position to assess its impact.” We concluded that the trial judge apparently did not find the remarks to result in substantial prejudice to sufficiently deprive the defendant of a fair trial. Id., 779 So.2d at 155.
Similarly, at the State’s motion to quash subpoenas directed to jurors hearing in the instant matter, the trial judge considered *357 arguments from both sides regarding the State’s comments and stated:
The court has read the authority provided and does note that if there is extraneous outside matters that may have been brought to bear on a jury, it certainly would be appropriate for the court to hear that in connection with their testimony. So that exception which would allow a juror to testily on the question of whether outside influence was improperly brought to bear on any juror usually are such things as threats to a juror or his family, robbery of a juror, coercion by a party or inadmissible evidence or other crimes obtained from an out-of-court source.
The judge found that the comments by the State that defense counsel spoke Spanish and the “under-the-breath” type of comments during closing arguments did not meet the criteria of outside influence, stating he found that “although [the juror affidavits] were well[-]pleaded, that the substance of what the jurors would testily do not amount to those matters that would be an outside influence.” We are persuaded by Eskano and find that the trial judge was in the best position to assess the alleged remarks at issue, and agree that the remarks did not meet the criteria of outside influence, and were normally done in the course of a trial.
| ^Furthermore, the jurors were specifically instructed by the judge that statements and arguments by the attorneys are not evidence, and they are to determine the facts only from the evidence presented. The jury was instructed not to consider any evidence which was not admitted, which they were instructed to disregard, or which an objection was sustained. The jurors were also instructed by both defense counsel and the State what evidence they could consider. Thus, we find that the jury was appropriately educated to disregard any statements by the State they may have overheard.
Therefore, we do not find the alleged comments and remarks made by the State at both the bench conference and during closing arguments rose to the level of “outside influence” to merit an evidentiary hearing. Accordingly, we do not find the trial court erred in denying Defendant’s Motion for New Trial.

Interview of Dr. Quo

Defendant argues the trial court erred in admitting Dr. Jeff Quo’s interview of A.C. at trial, when Dr. Quo was not called to testify about the interview or his findings. Defendant contends the interview by Dr. Quo should have been deemed inadmissible because it was not done during the course of diagnosis and treatment but was done to investigate a criminal offense. Defendant argues the interview by Dr. Quo was problematic in itself, as he was suggestive, awkward, and clumsy. Defendant further contends that it was an error for Dr. Benton to comment on Dr. Quo’s reports “despite the fact that he was only one of Dr. Quo’s supervisors, and not a primary supervisor who oversaw this particular interview.”
The State argues that Defendant’s arguments are not preserved for review because Defendant did not object when Dr. Benton was allowed to comment on Dr. Quo’s findings and Defendant “made clear he had no objection to the admission of medical records other than the statement of the victim.” Thus, the Instate argues Defendant only objected to the introduction of the victim’s statements to Dr. Quo on a single basis: the ability to cross-examine Dr. Quo. The State also contends that the trial court properly admitted the statements pursuant to La. C.E. art. 804(3). The State further posits that the only objection preserved for review is a violation of the Sixth Amendment, but that *358 argument was not briefed in Defendant’s appeal.
At trial, the State called Dr. Benton to the stand and moved to introduce the interview at Children’s Hospital conducted by Dr. Quo. Defendant objected to the transcript of the child's interview “conducted by Dr. Quo and the audio of that interview being published to the jury in any way.” However, Defendant spécifically noted that there was no objection to the medical records, the audio interview, and the transcript of the interview being introduced for “record purposes.” Defendant argued that “had the [SJtate called Dr. Quo as a witness, [they were] prepared to cross-examine him extensively on the improper techniques that were used in this case.” Defendant contended that if he .could not cross-examine Dr. Quo, he was denied his right to confrontation.
The trial judge, however, disagreed with Defendant’s position, finding that the statement and the transcription of the patient medical history taken for evaluation, diagnosis and treatment were not excluded by the hearsay rule. The trial judge went on to find:
And so the provisions of this statute adopted by the legislature clearly indicates that it can be published to the jury. I further carefully reviewed the statement itself and find that it is — it contains many many instances of information provided by the child that would lead — that a physician probably would need to know in order to conduct their evaluation. And it seems to me that the medical examination was conducted almost immediately after the statement was taken, not before, by the last comments on Page 21.
li>J concluded just based on my review of the statement and the clear and concise language of Article 803.4 that the statements are admissible and should be published.
La. C.E. art. 803(4) allows a hearsay exception for statements made for the purposes of medical treatment and medical diagnosis in connection with treatment, stating:
(4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
Official Comment (b) under this article states, [t]he phrase “reasonably pertinent to treatment or diagnosis in connection with treatment” has been interpreted to limit the scope of this exception to the kind of statements that are usually relied upon by physicians in their diagnosis and treatment of patients. Thus, statements as to the cause of a condition not reasonably pertinent to diagnosis or treatment of it are not within the ambit of this exception.
First, we find that the crux of Defendant’s argument at trial was that he was unable to cross-examine Dr. Quo because the State did not call Dr. Quo as a witness. Therefore, Defendant argued this violated his right to confrontation, as he had no opportunity to examine Dr. Quo about the “very leading statement” taken from the victim. Defendant did not argue that the interview between Dr. Quo and the victim was not in the course of diagnosis or treatment.
Under La. C.Cr.P. art. 841(A):
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A *359 bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
IgfiThe statute is specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings. State v. Carter, 10-973 (La.App. 5 Cir. 8/30/11); 75 So.3d 1, 6. Therefore, we find that Defendant waived any error based on these allegations by his failure to enter a contemporaneous objection that the interview between Dr. Quo and A.C. was not in the course of diagnosing or treatment.

Error Patent Discussion

Defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990) regardless of whether a defendant makes such a request.
In the present case, sentencing and the ruling on Defendant’s Motion for New Trial occurred on the same day. The trial judge failed to observe the twenty-four hour delay mandated by La. C.Cr.P. art. 873 between denying Defendant’s Motion for New Trial and sentencing. See State v. Nicholas, 10-866 (La.App. 5 Cir. 5/24/11); 67 So.3d 610, 617. Generally, when a defendant challenges a non-mandatory sentence and the delay is not waived, his sentence must be vacated and the case remanded for re-sentencing, unless the defendant does not challenge his sentence or show prejudice as a result of the failure to waive the 24-hour delay. State v. Jones, 07-271 (La.App. 5 Cir. 10/30/07); 970 So.2d 1143, 1149; State v. Stone, 05-82 (La.App. 5 Cir. 5/31/05), 904 So.2d 810, 816. Thus, absent a showing of prejudice, when a defendant does not waive the sentencing delay afforded in La. C.Cr.P. art. 873 and does not challenge the imposed penalty, the error may be harmless. State v. Wilson, 99-105 (La.App. 5 Cir. 7/27/99); 742 l?7So.2d 957, 959; See also State v. Seals, 95-0305, (La.11/25/96); 684 So.2d 368, 380, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
Here, while Defendant did not explicitly waive the delay for sentencing, he did not object to the sentence in the trial court or raise any issue regarding his sentencing on appeal. Thus, we find no corrective action is necessary. See State v. Butler, 09-314 (La.App. 5 Cir. 10/27/09); 28 So.3d 317, 324.
In addition, this Court has held that tacitly waiving the delays can eliminate the necessity of corrective action. In State v. Bibbins, 13-875 (La.App. 5 Cir. 4/9/14); 140 So.3d 153, 169-70, writs denied, 14-1015 (La.12/8/14); 153 So.3d 440 and 14-994 (La.12/8/14), 153 So.3d 439, this Court found that while the defendant did not expressly waive the mandatory statutory delay between the trial court’s ruling on the motion for new trial and the sentencing, the defendant did not object to proceeding with sentencing or raise the trial judge’s failure to observe the delay as an error.
Here, when queried if Defendant was ready for sentencing, defense counsel responded, “[y]es, we are, Your Honor.” This Court has previously held that a tacit waiver could be inferred under similar circumstances. See, e.g. State v. James, 527 So.2d 504, 505 (La.App. 5th Cir.1988) (the *360 delays were waived when counsel affirmatively responded to the trial court that the defendant was ready for sentencing). Thus, we find that Defendant did indeed tacitly waive delays.
Next, the record does not reflect that Defendant was notified of the sex offender registration requirements as required by statute. La. R.S. 15:540, et seq. requires registration of sex offenders and La. R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirement of La. R.S. 15:542. The trial judge failed to provide to Defendant the required written notice. Consequently, even though Defendant received a life sentence, we instruct the trial | adjudge to send written notice to Defendant of the registration requirement and to file a copy of same in the record, in accordance with State v. Stevenson, 00-1296 (La.App. 5 Cir. 1/30/01); 778 So.2d 1165. See also State v. Berniard, 03-484 (La.App. 5 Cir. 10/15/03); 860 So.2d 66, 78, writ denied, 03-3210 (La.3/26/04), 871 So.2d 345.
DECREE
For the foregoing reasons, the conviction and sentence of Defendant, Francisco Hernandez, are affirmed.

AFFIRMED

. In accordance with La. R.S. 46:1844(3), the victim, who is a minor, and the victim’s family members will be referred to by their initials to protect the victim's identity.

. Walter Almenderez, who lived in the home, was known as "Jimmy.” Defendant was known as "Chico.”

. Pablo Hernandez is Defendant’s brother.

. J.H. is J.C.’s son and A.C.’s half-brother.

. A.C.'s medical records and the audio and transcript of the interview between Dr. Quo and A.C., conducted on October 31, 2006, were published to the jury during the State’s direct examination of Dr. Benton.

. The offense occurred on or between November 1, 2005 and October 21, 2006.

. In Defendant’s motion for new trial, he referenced the court reporter’s tape as proof of his argument. However, the court reporter's tape was not introduced or accepted into evidence; thus, it is not before us for review.

. Defendant argues he was unaware of these comments occurring during closing arguments and, thus, could not contemporaneously object.

.The first juror’s affidavit stated that she could frequently hear arguments of the State at the bench, and they were asked to lower their voices. She overheard State’s counsel make a statement that defense counsel could speak Spanish. She also stated she heard a State attorney say that defense counsel "was *354 being untruthful'' during defense counsel’s closing argument.
The second juror’s affidavit stated he could overhear a State attorney say defense counsel could speak Spanish while at the bench conference. During closing arguments, he overheard prosecutors say defense counsel “was not speaking the truth.”
The third juror’s affidavit stated that at the bench conference, he overheard an attorney say defense counsel could speak Spanish. During closing arguments, while he heard a great deal of "mumbling,” he could not hear specific words of the prosecutor; however, he did observe "very dramatic facial expressions.”