HANS J. LILJEBERG, Judge.
|2Pefendant appeals his sentence imposed relative to his conviction for La. R.S. 14:30.1. For the following reasons, we affirm and remand with instructions.

Procedural History

On September 10, 2009, a Jefferson Parish Grand Jury indicted defendant, Arnold T. Ross, on one count of second degree murder of a known juvenile (D.O.B.8/11/08) in violation of La, R.S. 14:30.1 and one count of sexual battery of a known juvenile (D.O.B.8/11/08) in violation of La. R.S. 14:43.1.[1] On September 14, 2009, defendant pleaded not guilty at arraignment. On December 10, 2010, defendant withdrew his plea of not guilty and entered a plea of not guilty and not guilty by reason of insanity, but withdrew the plea prior to trial. Defendant proceeded to trial on July 11, 2013. On July 12, 2013, a. twelve-person jury Lreturned a unanimous verdict of guilty as charged on both counts of the indictment. On September 16, 2013, following a pre-sentence investigation and a Miller[2] hearing held pursuant to La.C.Cr.P. art. 878.1, the trial court sentenced defendant to life imprisonment at hard labor without benefit of probation dr suspension of sentence on count one and *985 a concurrent sentence of ten- years- imprisonment at- hard labor without benefit of probation, parole, or suspension of sentence on count two. Defendant orally objected to the severity of the sentence and later filed a motion to reconsider sentence, which the trial court denied on September 18, 2013. The trial court granted defendant’s timely motion for appeal on that same date. Defendant’s appeal follows.

Facts

At the time of the offense, D.[3], age 34, who was recently paroled for a drug offense, temporarily lived with her cousin and through her cousin came to know defendant, age 17.[4] D. also became very close with defendant’s family. Eventually, D. was able to secure an apartment in a complex on the West Bank of Jefferson Parish for her and her son, D.L., and was in the process of working a case plan to regain custody of hér two older children. D. worked as a prep cook at Kentucky Fried Chicken to support herself and her son, which required her to walk an hour each way to and from her apartment. While D. was at work, D. routinely left D.L., who was approximately nine-months-old, in the care 'of defendant’s sister, Khishannon Ross.
[4On the evening of June 5, 2009, defendant wént to D.’s apartment. He was upset, talking, and venting. Defendant left the apartment and then returned an hour later. D. and defendant spoke again and then went to bed. The next morning, defendant’s sister was not yet at the apartment when D. had to leave for work, so she asked defendant if he, could watch D.L. until his sister arrived to pick up D.L.[5] Defendant agreed, and D. changed D.L.’s onesie, made sure he was- dry, and fixed him a bottle, which- she left within his reach. D. also prepared and left D.L.’s baby bag. D. left the apartment and arrived at work at approximately 8:00 a.m.
Keshia and Leonard Schexnayder lived in the next apartment and shared a common bedroom wall with D. On that same morning, the Schexnayders were awakened by a door slamming shut and minutes later multiple knocks/hits/thumps against the common wall of the apartment. Several minutes after that, 'there was a “frantic knock” at their door. Mr. Schexnayder answeréd the door to find defendant upset and crying, stating the baby had fallen down, the stairs. Mr. Schexnayder rushed past defendant into the next-door apartment, where he found D.L. unconscious on the floor upstairs. The baby did not appear to be breathing, with his head “a little bit further than what it was supposed to be,” and mucus and blood coming from his nose and mouth. Mr. Schexnayder straightened the child’s head, and D.L. took a breath of air. Ms. Schexnayder took the baby downstairs while her husband phoned 911. Both the paramedics and the Jefferson Parish Sheriffs Office *986 responded to the scene. D.L. was not breathing, and he was transported to the hospital.
Deputies responded to what they bé-lieved at the time to be a “medical roll.” Defendant'was distraught and relayed to police that his girlfriend asked him to watch D.L. because she had to go to work early. Defendant stated that he went | ¡^downstairs to make a bottle for the baby, when he heard a thumping noise coming down the stairs. He ran to the stairs from the kitchen, where he found D.L. at the bottom of the stairs with his nose bleeding. Defendant stated that he placed the baby on the sofa and attempted CPR, which he did not know how to perform. Mr. Schex-nayder, however, told deputies that he found D.L. on the floor upstairs, not downstairs when he arrived. Defendant attempted to speak over Mr. Schexnayder, saying several times to the effect, “yeah, you remember the baby was down the stairs.” At that point, deputies separated defendant from Mr. Schexnayder.
After apprising their superiors of the situation, deputies were instructed to close off the scene. Defendant was Miran-dized[6] and placed in the backseat of a police unit. The deputies processed the scene,[7] and defendant was transported to the Criminal Investigations Bureau to be interviewed by Detective Jeffrey Rodrigue.
At approximately 9:30 a.m., D. received a phone call from police notifying her of an accident' at home. The police picked her up from work and brought her to the hospital.
At approximately 1:16 p.m. and again at 1:59 p.m., defendant waived his Miranda rights and gave two statements to Detective Rodrigue.[8] In his first statement to police, defendant admitted that he lied about D.L. falling down the stairs. He explained that after D. left for work, he returned to the bedroom to watch the movie Pineapple Express because he could not sleep.[9] He further explained that the television awakened D.L., who was asleep in the bed with him, Land he began to cry. Defendant attempted.to give D.L. his bottle, which he refused. Approximately 30 minutes later, D.L. had a bowel movement and defendant placed him in the bathtub, where D.L. continued to have bowel movements. Defendant took D.L. from the tub and placed him into a towel before bringing D.L. to change his clothes. In the bedroom, D.L. had another bowel movement, and at that time defendant spanked D.L.’s hand. Defendant stated that he spanked D.L. , a second time, missing D.L.’s hand and hitting him in the face with an open hand. Defendant said that he hit D.L. at least two to three times.[10] D.L. started to bleed from the nose and mouth, so defendant grabbed a bandana, wet it, and tried to stop the bleeding. When defendant returned to D.L., he was nearly unconscious, struggling to breathe, *987 and vomiting. At that time, defendant went to the neighbors’ home for help. He stated that he lied- to the neighbors and police about D.L. falling down the stairs because he was scared of going to jail. Defendant stated that before the neighbors arrived, he attempted to blow into D.L.’s mouth and push on his stomach.
At the conclusion of defendant’s first statement, Detective Rodrigue learned that D.L. died at the hospital and also sustained tearing to the anus. Based on this information, Detective Rodrigue interviewed defendant a second time. In his second statement, defendant explained that the trauma to D.L.’s anus occurred in the bathroom, while he attempted to prevent D.L. from having another bowel movement. Defendant expláined that he wrapped a towel around three or four fingers of his right hand and pushed his harid in D.L.’s anus up ---to the middle of his knuckle, in order to “stop the bowel movement from coming out.” Defendant said that he did this-to help D.L, not punish him. Defendant stated that- D.L. did not 17scream or cry while this was being done to him. This occurred before defendant struck D.L.
Later that day, Dr. Karen Ross, an assistant coroner and forensic pathologist for the Jefferson Parish Sheriffs Office, performed an autopsy of the victim. Dr. Ross determined the cause of death to be multiple blunt force injuries and agreed that the injuries were “consistent with a. child receiving blunt force trauma, over, and" over, and over again, multiple times, over an extended period of time, or at least over an extended single event.” Dr. Ross additionally concluded that the victim’s injuries were not consistent with a fall down the stairs or any attempt at CPR. She further relayed at trial that the victim’s injuries were- “some of the worst injuries that [she’d] ever personally had in an autopsy.”

Assignments of Error

On appeal, defendant asserts that the trial court erred in denying his motion to reconsider sentence and maintains that the life sentence imposed for his conviction for La. R.S. 14:30.1 is constitutionally excessive.

Law & Analysis

Defendant asserts that the trial court abused its discretion in imposing a life sentence for his conviction of La. R.S. 14:30.1, even'with parole eligibility, without due consideration as to whether the mandatory minimum sentence as applied to defendant was too severe and constitutionally excessive.
Conversely, the State argues that defendant’s sentence is commensurate with the nature and severity of the crime and that the alleged mitigatory factors of his educational level and mental 'health history were introduced at the Miller hearing and considered by the trial court when imposing sentence. 'The State concludes that the defendant has failed to rebut the presumption of constitutionality of his mandatory life sentence..
 | ¡¿Both the Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive and cruel punishment. State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622; State v. Girod, 04-854 (La.App. 5 Cir. .12/28/04); 892 So.2d 646, 650 writ denied, 05-0597 (La.6/3/05), 903 So.2d 455. A sentence is excessive, even when it is within the applicable statutory range, if- it is grossly disproportionate to the seriousness of the offense so as to shock our sense of justice, or if it imposes needless and purposeless pain and suffering. State v. Payne, 10-46 (La.App. 5 Cir. 1/25/11), 59 So.3d 1287, 1294, writ denied, 11-0387 (La.9/16/11), 69 So.3d 1141; State v. Loba- *988 to, 603 So.2d 739, 751 (La.1992); State v. Brown, 01-160 (La.App. 5 Cir. 5/30/01), 788 So.2d 667, 674. In reviewing a sentence for excessiveness, the appellate court must considerthe punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice. Payne, supra; State v. Dorthey, 623 So.2d 1276, 1280 (La.1993).
A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a " manifest' abuse of ' discretion. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1, 4. On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Brown, 04-230 (La.App. 5 Cir. 7/27/04), 880 So.2d 899, 902, citing Smith, supra.
This Court' has recognized that a mandatory minimum sentence is presumed to be constitutional. State v. Shaw, 12-686 (La.App. 5 Cir. 1/16/13), 108 So.3d 1189, 1196, citing State v. Hernandez, 03-424 (La.App. 5 Cir. 10/15/03), 860 So.2d 94, 97. A trial court may ¡depart from-a mandatory minimum sentence only if it finds clear and convincing evidence rebutting the..presumption of ^constitutionality. - • State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 676. In order to rebut the presumption, the defendant has the burden of showing that -“[h]e is exceptional, which in this- context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender,-, the gravity of the offense, and the circumstances of the case.” Id. Downward departures should only occur in rare situations. State v. Ventress, 01-1165 (La.App. 5 Cir. 4/30/02), 817 So.2d 377, 384, citing Johnson, supra at 677.
In 'this matter, defendant was convicted of second degree murder. La. R.S. 14:30.1 provides that “[wjhoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.” La. R.S. 14:30.1(B). In Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012), however, the United States Supreme Court held that mandatory life imprisonment without parole for those offenders under the age of eighteen .at the time of the commission of the offense violates the Eighth Amendment prohibition against cruel and unusual punishment. The Miller Court did not. establish a categorical prohibition against life without parole for juveniles,; but instead required that the statutory sentencing scheme authorize a sentencing court to consider an offenders youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest penalty for -juveniles who have committed a homicide offense. State v. Stewart, 13-639 (La.App. 5 Cir. 1/31/14), 134 So.3d 636, 639; State v. Williams, 12-1766 (La.3/8/13), 108 So.3d 1169.
In light of Miller, the legislature, during the 2013 Regular Session, enacted La. C.Cr.P, '.art. 878.1- and. La.. R.S. 15:574-.4(E)(1), allowing parole- consideration for juveniles sentenced to life imprisonment for certain homicide offenses after a |^sentencing hearing. Article. 878.1, which became effective August 1, 2013, provides as follows:
A. In any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) ■ where the offender was under the age of eighteen years at the time of *989 the commission of the. offense, a hearing shall be conducted prior to sentencing to determine whether the sentence shall be imposed with or without parole eligibility pursuant to the provisions of R.S. 15:574.4(E).
B. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender’s level of family support, social history, and such other factors as the court may deem relevant. Sentences imposed without parole eligibility should normally be reserved for the.worst offenders and the worst cases. . •
La. R.S. 15:574.4(E)(1) provides in part'as follows:
E. (1) ■ Notwithstanding any provision of law to the' contrary, any person serving a sentence of life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) who was under the age of eigh-. teen years at the timé of the commission of the offense shall be eligible for parole consideration pursuant to the provisions of this Subsection if a judicial determination has been made that the person is entitled to parole eligibility pursuant to Code of Criminal Procedure Article 878.1 and all of the following conditions have been met:
(a) The offender has served thirty-five years of the sentence imposed.
(b) The offender has not committed any disciplinary' offenses in the twelvé consecutive months prior to the parole eligibility date.
(c) The offender has ■ completed the mandatory minimum of one hundred hours of prerelease programming in accordance with R.S. 15:827.1,
(d) The offender has completed substance abuse treatment as applicable.
(e) The offender has obtained a GED certification, - unless the offender has previously obtained a high school diploma or is deemed by a certified educator as being incapable of obtaining a GED certification due to a learning disability. If the offender is deemed incapable of obtaining a GED certification, the offender shall complete at least one of the following:
lii(i) A literacy program.
(ii) An adult basic education program.
(iii) A job skills training program.
(f) The offender has obtained a low-risk level designation determined by a validated risk assessment instrument approved by the secretary of the Depart..ment of Public Safety and Corrections.
■ (g) The offender has completed a reentry program to be determined by the Department of Public Safety and Cor- . rections. ,
As defendant was 17-years-old at the time of the commission of the instant offense, a Miller hearing was held pursuant to La., G.Cr.P. art. 878.1, after which the trial court sentenced defendant to life imprisonment with the benefit of parole eligibility pursuant to La. R;S. 14:30.1 and La. R.S. -15:574.4(E)(1). At sentencing, defendant orally objected: to “the severity of the sentence” and moved: for reconsideration of- sentence, which the trial court denied.[11]
*990 At the Miller hearing and now on appeal, defendant asserts that his age, low educational background, and mental health history are mitigating factors that the trial court should and did not consider prior to or in reconsideration of imposing the mandatory minimum sentence. The record reflects, however, that the trial court was aware and indeed took into consideration these factors when choosing to impose the more lenient sentence of life imprisonment with the benefit of parole rather than the statutory mandatory minimum sentence of life without benefits.
The record reflects that the trial court heard the testimony of Dr. Sarah Deland, a' forensic psychiatrist, who testified on behalf of defendant at the Miller hearing. Dr. Deland interviewed and assessed defendant’s school, medical, jail, |12and Social Security records. While she offered mitigation evidence of defendant’s learning disabilities, minimal educational achievement, and diagnosis of a mood disorder, she ultimately opined that despite defendant’s problems, he knew the difference between right and wrong at the time he committed the offense.
Further, the horrific and h'eihous nature of defendant’s offense outweighs any mitigating factors offered by defendant for any further departure from the mandatory minimum sentence. ' The autopsy performed of the nine-month-old victim revealed “some of the worst injuries” Dr. Karen Ross had seen in an autopsy in her career. The victim had large areas of bruising. on both cheeks, with multiple small abrasions on the left ■cheek, which could have resulted from fingernail marks. One of the'contusions appeared consistent with a finger mark or slap mark, which went over the front of the face, to the' tip of the nose, and under the eye to the nasal bone. A large purple contusion spanned almost the entirety of D.L.’s face. The victim suffered blunt force trauma to the recessed area of the eye socket consistent with an intentionally inflicted injury like a punch or kick. Both of his ears were bruised, with a sharp laceration on the back right ear, as well as lacerations to the victim’s lips and tongue.
The autopsy further revealed blunt force trauma to the upper neck/lower head and at least seven to nine areas of impact to the top of the head. Overall, D.L. sustained at least three skull fractures, which were consistent with multiple impacts to the front of the head, the back of the head, and the top of the head. The victim had hemorrhaging around his brain and swelling.
Dr. Ross further reported bruising to the victim’s chest area and the midportion of his back, with evident scratches to his trunk. Except for the first and last one, all of D.L.’s ribs were fractured at multiple sites, with his sixth rib broken in two. The broken ribs tore the soft tissue lining, which allowed blood to flow into | isthe body cavity. Both lungs were also tom at multiple sites. In addition, the victim sustained lacerations to both his spleen and liver. Again, Dr. Ross contributed the victim’s injuries to blunt force trauma.
Finally, Dr. Ross testified that the autopsy revealed at least four lacerations around D.L.’s anus going both toward the penis and perineum, and then posteriorly towards the back of his body and up to the area of the rectum, approximately onehalf inch deep. Dr. Ross testified that the degree of tearing was indicative of intentionally inflicted injury.
Moreover,. evidence presented at trial showed that defendant attempted to clean up the scene and concocted another version of events in an attempt to conceal his crime.
Based on the foregoing testimony and evidence, we find that defendant has failed *991 to rebut the presumption of constitutionality. of his sentence. Defendant has not presented clear and convincing evidence to suggest his situation is the kind of rare situation that warrants a downward departure. We further find that the sentence imposed is not constitutionally excessive as it is not grossly out of proportion to the seriousness of the offense, nor does it shock the sense of justice. , .
Accordingly, we find that the trial .court did not abuse its broad sentencing discretion in imposing the mandatory minimum term of imprisonment under the circumstances- of this case. As such, the trial court did not err in denying defendant’s motion to reconsider sentence.

Errors Patent

The record was reviewed for errors patent pursuant to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Wetland, 556 So.2d 175 (La.App. 5th Cir.1990). A review' of the record reveals two errors patent requiring corrective action. •
| uFirst, although the commitment reflects that defendant was given a proper advisal .of the time period for seeking post conviction relief as required by La.C.Cr.P. art. 930.8, the transcript indicates that the trial court failed to give such an advisal. The transcript prevails when there is‘a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983). Therefore, we advise defendant, by way of this opinion, that no application for post conviction relief, ⅛ eluding an application which seeks an out-of-time appeal, shall be considered if it is filed more thán two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 and 922. See State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030.
Second, as noted in the State’s brief, the record reflects that the trial judge failed to advise defendant of the sex offender registration requirements. La. R.S. 15:540, et seq. requires registration of sex offenders. Defendant’s conviction of La. R.S. 14:43.1 is defined as a sex offense by La. R.S. 15:541. Further, La. R.S. 15:543(A) requires the trial court to provide written notification of the registration requirement of La. R.S. 15:542. The trial court’s failure to provide- this notification constitutes an- error patent and warrants remand for written notification. See State v. Morgan, 06-529 (La.App. 5 Cir. 12/12/06), 948 So.2d 199, 213; Thus, we remand the matter to the trial court to provide written notification to defendant of the sex offender registration requirements set forth in La. R.S. 15:542. The trial court is instructed to inform defendant of his notification and registration requirements .using the form contained in La. R.S. 15:543.1 within ten days of this Court’s opinion and to furnish the record with proof of such notice.
| ^Decree
Considering the foregoing, we affirm defendant’s sentence relative to his conviction for La. R.S. 14:30.1." The matter is remanded with instructions to correct the noted errors patent. '

AFFIRMED & REMANDED WITH INSTRUCTIONS

. Preceding the indictment; the trial court found defendant competent to stand trial after a hearing held on July 22, 2009.

. Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012).

. In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46;1844(W)(3), the judges,.of this Court have adopted a policy that this Court’s published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim’s identity (i.e., parent, sibling, or relative with the same last name as the victim). State v. E.J.M., III, 12-774 (La.App. 5 Cir. 5/23/13), 119 So.3d 648, 652 n. 1. Compare State v. R.W.B., 12-453 (La.12/4/12), 105 So.3d 54. Recause the mother and the victim in this case share the same initials, the mother will be referred to as "D.” and the victim will be referred to as "D.L.”

. D. testified that she and defendant' were "good friends;" however, defendant’s mother and stepfather testified that their relationship was romantic. Also, defendant referred to D. as his girlfriend in his statement to police, which was admitted into evidence at trial.

. D. testified that defendant watched D.L. for brief periods of time in the past.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. In processing the scene, deputies documented physical damage to or holes in the kitchen pantry door and upstairs master bedroom door. Deputies further photographed a full baby bottle in the upstairs closet and a broken hair brush in the upstairs bathroom. Further admitted into evidence were photographs of a yellow bath towel and blue baby blanket that deputies found outside the back door of the apartment in addition to a soiled diaper collected from the kitchen floor and a "hospital style blanket” stained with fecal matter.

. Audio recordings of defendant’s statements were played for the juty at trial.

. Deputies photographed a DVD hand-marked with the title Pineapple Express still enclosed in its case on the bottom shelf of the television stand in the bedroom, which was admitted into evidence at trial.

. Defendant admitted that at 6'7"" tall, he has big, heavy hands.

. Although defendant did not specifically argue for a downward deviation from the mandatory minimum life sentence during sentencing or when he moved for reconsideration of his sentence, this -Court has found that a Dor-they claim is encompassed in the Court's review for constitutional excessiveness. Shaw, supra at 1196, citing State v. Horne, 11-204 (La.App. 5 Cir. 2/14/12), 88 So3d 562, 569, writ denied, 12-556 (La.6/1/12), 90 So.3d 437 See also Dorthey, supra.