STATE OF LOUISIANA

VERSUS

C. T.

NO. 18-KA-650

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 15-5781, DIVISION "B"
HONORABLE CORNELIUS E. REGAN, JUDGE PRESIDING


July 30, 2019


**HANS J. LILJEBERG**
**JUDGE**


Panel composed of Judges Stephen J. Windhorst,
Hans J. Liljeberg, and Timothy S. Marcel, Pro Tempore


<u>**AFFIRMED; REMANDED WITH INSTRUCTIONS**</u>
**HJL**
**SJW**
**TSM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Paul D. Connick, Jr.
     Terry M. Boudreaux
     Juliet L. Clark

COUNSEL FOR DEFENDANT/APPELLANT,
C. T.
     Martin E. Regan, Jr.

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA, DEPARTMENT OF JUSTICE
     Jeffrey M. Landry
     Colin Clark
     J. Taylor Gray

**LILJEBERG, J.**

Defendant appeals his conviction and sentence for aggravated rape of a juvenile under the age of thirteen. For the following reasons, we affirm defendant's conviction and sentence. We also remand to the trial court with instructions to provide defendant with written notice of the sex offender registration requirements, as required by La. R.S. 15:543.

## STATEMENT OF THE CASE

On January 28, 2016, a Jefferson Parish Grand Jury returned an indictment charging defendant, C.T.,[1] with aggravated rape[2] of a known juvenile (D.O.B. 8/26/2004), where the victim was under the age of thirteen, in violation of La. R.S. 14:42. The matter proceeded to trial, and a twelve-person jury returned a verdict of guilty as charged on November 8, 2017.[3] On December 11, 2017, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant appeals.

## FACTS

The victim, D.A., was born on August 26, 2004, and he was thirteen years old at the time of trial. At trial, D.A. testified that he has one brother and two sisters. He stated that when he was eight years old, he began living with his father, who is the defendant herein, and his grandmother in Metairie, Louisiana. In July of 2015, D.A. went to visit his mother, A.A., who lived in Ponchatoula. While he was in bed with his younger sister, they began touching each other, and he put his "private into her front." D.A. testified that when his mom came into the room and

---

[1] In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (i.e., parent, sibling, or relative with the same last name as the victim). *State v. Ross*, 14-84 (La. App. 5 Cir. 10/15/14), 182 So.3d 983, 985 n.3. Here, while the victim and defendant do not have the same last name, defendant is the victim's father, and thus, use of his name or the names of his family members could arguably lead to the victim's identity.

[2] After the offense in this case, La. R.S. 14:42 was amended in 2015 by La. Act No. 184, to rename the offense of aggravated rape to first degree rape.

[3] Trial commenced on two previous occasions in this matter resulting in mistrials on May 10, 2017 and August 30, 2017.

asked what was going on, he confessed that he did that because "it was the same thing my dad did to me." D.A.'s mother took him to the doctor and he was also questioned by police, informing them of what defendant had done to him. D.A. also recalled that prior to moving in with defendant, he briefly lived with a family friend named Kandi Fields and confided in her that once while at defendant's house, he woke up lying next to defendant with his pants down.

Brittney Bergeron, a forensic interviewer for the Jefferson Children's Advocacy Center (CAC), interviewed D.A. on August 13, 2015. During the interview, D.A. told Ms. Bergeron that in the summer when he was eight years old, he lived with defendant and got a "whooping" for breaking a plate but stated that the "whooping" was not like a regular "whooping" because it hurt inside his "butthole" and that "it felt stretched out." D.A. explained that he first got fifteen whips with the belt on his bare buttocks. He told Ms. Bergeron that when he gets hit with the belt defendant makes him take his pants and underwear off and hits him on the "butt cheek," thighs, and lower back. Then after he was hit, defendant "bent over on me and did something I didn't understand." D.A. explained he was lying on his stomach when defendant bent over him on his hands and knees "like a dog getting ready to use the bathroom" and then "a warmish cylinder like thing [was] going into my butthole." At first D.A. did not know what the "cylinder like thing" was; he thought maybe it was defendant's finger, but it kept going "in and out, in and out of his butthole." He assumed it was defendant's "private part" but was asking himself "why would he do that." After about thirty seconds to a minute defendant stopped, told D.A. to put his clothes back on, and then told him he had gotten a "whooping." D.A. thought to himself "that was not a whooping."

D.A. stated that defendant would "sometimes put lotion on his butt cheek." He indicated that it happened more than one time, recalling that when he was nine, while at his grandmother's house with defendant, defendant told D.A. that he liked

to "make up stories," so he made up a story that D.A. had misplaced something and it was time for him to get a "whooping," telling him to take off his pants and underwear. Defendant told D.A. he had to take his clothes off to "see how much it hurts." So D.A. "got in the same position," and defendant hit him on the "butt cheek" with the belt twice and then defendant rubbed his own private part with his hand while leaning on the side of the bed. He then bent over D.A. "like a baby crawling" and stuck his private part in D.A.'s "butthole" "in and out, in and out." After he was finished, he told D.A. to put his clothes back on. D.A. stated that on that occasion defendant put coconut lotion on D.A.'s "butt cheeks" and his "butthole." D.A. also confessed that defendant scares him, and he did not want to tell anyone about what happened because defendant threatened to hurt his family members.

D.A. then recalled a third incident when he was nine or ten years old, and defendant called him upstairs and accused D.A. of breaking his television. When D.A. denied it, defendant told D.A. "you're getting a whooping" and then had D.A. take off his pants and underwear, placed lotion on D.A.'s "butthole" and "butt cheek," took off his own clothes, and he stuck his "private part" in and out of D.A.'s "butthole."

Lastly, D.A. explained a fourth incident in which defendant accused D.A. of not rolling his window down in the car, and defendant told him he was getting a "whooping." He recalled defendant took off his pants and underwear and D.A.'s pants and underwear, and hit him twenty times with the belt on his back, his buttocks, and his hand. He stated that defendant got "more mad," rubbed lotion on himself and on D.A.'s "butthole" with his finger, and then stuck his "private" in D.A.'s "butthole" several times. When he was done he told D.A. to go back to his room and think about what he had done. D.A. also stated that when he was ten he

found a video in defendant's drawer, and when he turned it on it was a video of "naked girls," so he turned it off and put it back.

D.A. testified that he never told anyone about what his father did to him during the two years he lived with defendant because he was scared to tell his family. He explained that defendant had threatened to hurt someone in D.A.'s family if D.A. told anyone. He further testified that he had lived with his mother's other boyfriends, and none of them had ever sexually abused him.

On August 1, 2015, Dr. Sonseeahray Bridges, a pediatric physician at Children's Hospital in New Orleans, examined D.A. who was brought to the hospital by his mother, along with his sister, K.A. His mother, A.A., reported that she found D.A. in bed with his sister with no pants or underwear on and that her daughter disclosed to her that D.A. had put his penis in her butt on more than one occasion. A.A. also advised Dr. Bridges that D.A. reported to her that defendant had done the same thing to him, "meaning that he had put his penis in D.A.'s butt." D.A. told Dr. Bridges that it occurred with his father more than once. Dr. Bridges testified that D.A.'s physical examination was normal, explaining that D.A.'s last contact with his father was three weeks prior to her examination giving any evidence of potential trauma time to have healed.

Kandi Fields, a family friend, testified that when D.A. was seven or eight years old, A.A. moved to Texas. Ms. Fields stated that D.A. lived with her for approximately two weeks, and this was before he moved in with defendant. During that two-week period, defendant would pick D.A. up from Ms. Fields' home and keep him over the weekend. After one of his weekend visits with defendant, D.A. reported to Ms. Fields that defendant was "crazy" and "nasty." When asked what he meant, D.A. began to cry and stated, "my daddy licks my butt when he thinks I'm asleep." Mrs. Fields called A.A. who drove back from Texas and picked up D.A.

A.A. testified that defendant is her ex-boyfriend and that D.A. is their son who was born on August 26, 2004, after they had ended their relationship. In 2012, A.A. moved to Texas with her two daughters, leaving D.A. with Mrs. Fields because she believed the move would be difficult for him being the eldest of the children. A.A. recalled that prior to moving to Texas, defendant had come back into D.A.'s life, which pleased her, knowing the importance of having a father figure.

A couple of weeks after she moved to Texas, A.A. received a phone call from Mrs. Fields prompting her to return to Louisiana to retrieve her son. She recalled that D.A. would not tell her what he had told Mrs. Fields and that she told him she was going to have to call the police, yet never did, wanting to believe it was not possible.

A.A. took D.A. back to Texas with her in 2012 but eventually returned to Louisiana. In the summer of 2013, when D.A. was about eight years old, A.A. moved to Pontchatoula and sent D.A. to live with defendant. A.A. testified that she allowed D.A. to live with defendant because she wanted D.A. to have a relationship with his father and D.A. told her that what he had told Mrs. Fields did not happen.

A.A. testified that in July of 2015, after D.A. had been living with defendant for approximately two years, D.A. came to visit her for three weeks in Ponchatoula, where she was living at the time with her fiancé. One night during his visit, D.A. went to bed with his sister, K.A., and when A.A. went to check on them, she could "tell something was going on," so she pulled back the covers and saw K.A.'s underwear was off. A.A. asked D.A. what was going on and based on his response, immediately called defendant yelling, "here we go again with this." Defendant told A.A. that D.A. was lying, at which time A.A. hung up on him and

called the police. After speaking to the police, D.A. was sent to Children's Hospital where A.A. relayed to Dr. Bridges what had happened.

Dr. Jamie Jackson, an expert in the field of child abuse pediatrics, testified that she met with D.A. on August 24, 2015, and conducted a physical examination, which revealed no acute injuries. Dr. Jackson explained that she did not find this surprising because there are not always physical injuries present when an examination has been performed on a victim of sexual abuse. Dr. Jackson explained that most sexual abuse examinations result in normal findings, particularly when the sexual abuse involves penetration of the anus due to the body's ability to heal quickly in that area. She also noted that the last reported trauma had been six weeks prior to her examination.

Defendant's mother, E.T., testified that defendant and D.A. lived with her for two and a half years when D.A. was between the ages of eight and ten and that during that time D.A. did not want to be there. E.T. testified that while he lived with them, D.A. behaved "terrible," some nights getting up to watch "dirty movies" on the HBO channel and at times intentionally failing to flush the toilet after he had been reprimanded, even smearing "his bowels" on her rug on one occasion. E.T. testified that she overheard D.A. state that he wanted to be with his mother, and not his "black family." She further stated that she never saw any inappropriate behavior between D.A. and defendant.

Terry Lee, E.T.'s next-door neighbor, testified that he bought D.A. a bike after he moved in with his grandmother and that D.A. told him he could not ride the bike "because his mother is white and his father is black and he didn't want to get dark." D.A. told him he did not want to be black, he wanted to be more like his mother and grandmother, or light-skinned like his sisters. He further stated that one time when D.A. came over to his house he "wasn't acting normal" and that he could not get D.A. to talk, so he told E.T. that her grandson could not come to his

house again. According to Mr. Lee, D.A. would not play outside with the other children.

R.T., defendant's sister, testified that defendant and D.A. lived with her for a few weeks, and she never saw anything inappropriate occur between them. She also testified that D.A. stated several times that he did not want to be with his "black family."

## LAW AND DISCUSSION

In his first assignment of error, defendant asserts that the evidence was insufficient to support the jury's verdict beyond a reasonable doubt. Defendant provides no argument in support of this assignment; rather, he supplies only general law regarding appellate review of sufficiency cases. Nevertheless, we have reviewed the issue pursuant to *State v. Raymo*, 419 So.2d 858, 861 (La. 1982),[4] and the record reflects that the State presented sufficient evidence to establish the essential statutory elements of aggravated rape of a juvenile under the age of thirteen.

The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *State v. Lewis*, 04-1074 (La. App. 5 Cir. 10/6/05), 916 So.2d 294, 298, *writ denied*, 05-2382 (La. 3/31/06), 925 So.2d 1257.

At the time of the offense, La. R.S. 14:41 and La. R.S. 14:42(A)(4) defined aggravated rape as "the anal, oral, or vaginal sexual intercourse, with a male or female person, committed without the person's lawful consent," "[w]hen the

---

[4] In *Raymo*, *supra*, the Louisiana Supreme Court held that "[b]ecause the state's case was devoid of evidence of an essential element of the charged offense ... defendant's conviction and sentence must be set aside ... regardless of how the error is brought to the attention of the reviewing court." (Citations omitted.) *See State v. Mosely*, 08-1319 (La. App. 5 Cir. 5/26/09), 16 So.3d 398, 401.

victim is under the age of thirteen years." "Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. R.S. 14:41(B).

In sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. *State v. Hernandez*, 14-863 (La. App. 5 Cir. 9/23/15), 177 So.3d 342, 351, *writ denied*, 15-2111 (La. 12/5/16), 210 So.3d 810. Convictions of aggravated rape and other sexual abuse offenses have been upheld by this Court in the absence of medical evidence or other corroborating evidence. *See Hernandez*, 177 So.3d at 352; *State v. Roca*, 03-1076 (La. App. 5 Cir. 1/13/04), 866 So.2d 867, *writ denied*, 04-583 (La. 7/2/04), 877 So.2d 143; *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1233; *State v. Raye*, 17-136 (La. App. 5 Cir. 10/25/17), 230 So.3d 659, *writ denied*, 17-1966 (La. 6/15/18), 257 So.3d 674.

In the present case, through the testimony at trial and the evidence introduced, including D.A.'s CAC interview which detailed the anal intercourse he suffered at the hands of his father during a two-year period when he was between the ages of eight and ten years old, a rational trier of fact could have found defendant guilty of aggravated rape of a victim under the age of thirteen years beyond a reasonable doubt. Accordingly, this assignment of error is without merit.

In his second assignment of error, defendant argues the trial court erred in denying his request for a mistrial during the State's rebuttal closing argument. He contends that the prosecutor made a direct reference to defendant's failure to testify and, thus, the trial court was required to declare a mistrial.

The State responds that the prosecutor neither directly, nor indirectly, commented on defendant's failure to testify. Nevertheless, even if the prosecutor's statement was otherwise improper, the State contends that there is no indication in

the record that the remarks made by the prosecutor influenced the jury or contributed to the verdict.

During the State's closing argument, it referenced the CAC video that was shown during the victim's testimony and noted, "[y]ou saw how his father reacted to him watching the video, and that's where it was all laid out in front of you, and the truth finally came to the surface that [defendant] raped" D.A. In response, during its closing, the defense referenced the State's comment regarding defendant's reaction to the playing of the CAC video, arguing, "of course, [defendant] is going to be visibly upset when his son gets on the stand and says these lies about his father, and the [State] wants you to believe that because he is upset about that it must mean that he is guilty." Then, during rebuttal closing argument, the State countered, "[t]hey talked to you about her client getting upset during the video watching his son talk about what he did to him, and that he got visibly upset. I agree. He did. But you want to know what he didn't do, he never shook his head no."

Defense counsel objected to the State's comment that defendant "never shook his head no," and a bench conference was held. During the bench conference, defense counsel argued that the State had made a direct comment on defendant's failure to testify. Defense counsel further noted that while reference to her client's reaction was made during her closing argument, it was only done so in response to the State's initial comment. The State indicated that it would "move on," so the bench conference concluded and the trial court advised the members of the jury that "what the attorneys say in closing arguments are not evidence. It is just their opinion. The evidence comes to you from the witness stand, and that's the only place." It was after this admonition that the defense moved for a mistrial, without providing reasons, which was denied by the court.

After the jury charges were read to the jury and the alternate juror was dismissed, the defense requested that additional details be put on the record regarding the motion for mistrial made during closing arguments. Defense counsel then noted for the record that the Louisiana Code of Criminal Procedure "prohibits the prosecution from making a direct or indirect reference to a defendant's failure to take the stand or testify." Defense counsel further submitted that such a reference is not subject to a harmless error analysis, and claimed that a mandatory mistrial should be granted in this case due to the State's "direct reference to our client not denying it, not shaking his head during the testimony of the witnesses." In response, the State argued that it was the defense who first referenced during closing that defendant was visibly upset when the CAC video was being played because "he was so upset to see his child say these lies about him," so a comment was made in response during rebuttal regarding defendant's lack of remorse "based on his own actions and demeanor." Defense counsel argued that the State "cannot comment on the lack of remorse or what [defendant] did or didn't testify to," warranting a mandatory mistrial. Defense counsel further indicated that even if only an indirect reference was made, no one else besides the defendant could refute the allegations against him, thus, requiring a mandatory mistrial. The court again denied defendant's motion.

> Article 770 of the Louisiana Code of Criminal Procedure provides:
>
> Upon motion of a Defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> * * * *
>
> (3) The failure of the Defendant to testify in his own defense.
>
> * * * *
>
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the Defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

La. C.Cr.P. art. 770(3) prohibits both "direct" and "indirect" references to a defendant's failure to testify at trial. Where a reference to the defendant's failure to take the stand is direct, a mistrial should be declared, and it is irrelevant whether the prosecutor intended for the jury to draw unfavorable inferences from the defendant's silence. *State v. Mitchell*, 00-1399 (La. 2/21/01), 779 So.2d 698, 701; *State v. Fullilove*, 389 So.2d 1282, 1284 (1980). As stated in *Mitchell*, 779 So.2d at 701, "[t]he purpose behind art. 770(3)'s prohibition against such prosecutorial comment is to protect the defendant's Fifth Amendment right against self-incrimination by preventing attention being drawn directly or indirectly to the fact that the defendant has not testified on his own behalf."

When the reference to the defendant's failure to take the stand is not direct, the court should inquire into the remark's "intended effect on the jury" in order to distinguish indirect references to the defendant's failure to testify, which are impermissible, from statements that are not (which are permissible, though not favored). *Mitchell*, 779 So.2d at 701; *Fullilove*, 389 So.2d at 1284; *State v. Jackson*, 454 So.2d 116, 118 (La. 1984). In order to support the granting of a mistrial, the inference must be plain that the remark intended to focus the jury's attention on the defendant's not testifying. *Mitchell*, 779 So.2d at 701.

In *State v. Juniors*, 03-2425 (La. 6/29/05), 915 So.2d 291, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006), the defendant claimed his death sentence was the product of an array of arbitrary factors erroneously interjected into the sentencing proceeding, including the State's comment made during closing argument on his failure to testify. During closing argument the prosecutor stated:

> I have a tough job. I normally enjoy my job. Sometimes my job is sickening. It's sickening because you've not heard, you have not heard the words "I'm sorry."

> He talks about Glynn Juniors being remorseful. You never heard in this statement that he said, I'm sorry.

*Juniors*, 915 So.2d at 335.

The defendant in *Juniors* claimed the prosecutor's statement was a direct comment on his failure to testify, an impermissible avenue of attack that tainted the entire sentencing proceeding. The Louisiana Supreme Court disagreed, finding the prosecutor's comments were directed more toward the defendant's lack of remorse than his failure to testify. It found the prosecutor intended his comments to point to the defendant's character and propensities rather than to highlight the fact that he did not testify.

In *State v. Thomas*, 16-578 (La. App. 5 Cir. 4/19/17), 217 So.3d 651, *writ denied*, 17-1153 (La. 8/31/18), 251 So.3d 411, the defendant argued on appeal that the trial court erred in denying his motion for a new trial based on an alleged improper argument made by the State in its closing argument where the State commented on the defendant's refusal to consent to his blood being drawn to prove his innocence. The defense objected to the State's comment at trial and moved for a mistrial, which was denied by the trial court, who then provided an admonishment to the jury not to consider the State's comment because it was not in evidence.

In *Thomas*, this Court found the State's remarks in closing argument regarding the defendant's failure to consent to DNA testing were not direct references to his failure to testify and concluded that the comments made by the State were not intended as an invitation to the jury to draw an admission of guilt from the defendant's failure to testify but to rebut the defendant's claim of innocence and misidentification. The court went on to note that although the comments were intended to suggest defendant's guilt, they were not intended for the jury to draw an admission of guilt from the defendant's failure to testify. Thus,

this Court held the State's comments were neither a direct nor impermissible indirect reference to the defendant's failure to testify, and therefore, a mistrial was not mandated by La. C.Cr.P. art. 770(3). *Thomas*, 217 So.3d at 684.

In this case, as in *Juniors* and *Thomas*, the prosecutor's comment "you want to know what he didn't do, he never shook his head no," appears to be directed toward defendant's lack of remorse and/or to suggest defendant's guilt rather than meant to have the jury draw an admission of guilt from his failure to testify. We note that the prosecutor's comment during rebuttal closing argument was made in response to defendant's closing argument during which he drew attention to the fact that defendant became "visibly upset" when watching the CAC video. The State argued that while "visibly upset," "[defendant] never shook his head no" to illustrate his lack of remorse—"based on his demeanor"—so as to counter defendant's submission to the jury that he was visibly upset because of the "lies" his son had told about him. Accordingly, we find the State's comment was neither a direct nor impermissible indirect reference to defendant's failure to testify, and therefore, a mistrial was not mandated by La. C.Cr.P. art. 770(3).

In his third assignment of error, defendant contends that his conviction by a non-unanimous jury (eleven in favor and one against) violated his Sixth Amendment right to a fair trial. Defendant notes that a constitutional amendment to end non-unanimous jury verdicts in Louisiana was approved by voters of this State on November 6, 2018, and took effect January 1, 2019. He explains the amendment to La. C.Cr.P. art. 782 rids the former statute of its obvious prejudicial racial component, noting that until recently Louisiana was only one of two states in this country to allow for non-unanimous jury verdicts. Accordingly, defendant submits that his conviction by a non-unanimous verdict should be reversed.

Statutes are presumed to be constitutional, and the party challenging the validity of the statute bears the burden of proving it is unconstitutional. *State v.*

*Hatton*, 07-2377 (La. 7/1/08), 985 So.2d 709, 719. While there is no single procedure for attacking the constitutionality of a statute, the Louisiana Supreme Court has held that in order to properly confect a constitutional challenge, a party must raise the issue in the trial court in a pleading asserting the grounds for the alleged unconstitutionality. *Id.*

On April 8, 2017, defendant filed a "Motion to Declare Article 782(A) Unconstitutional Because it Allows for a Non-Unanimous Verdict in a Felony Trial." In the motion, defendant argued that La. C.Cr.P. art. 782(A) violated his constitutional rights and that the reasoning in *Apodaca*[5] was questionable in light of more recent Sixth Amendment and due process jurisprudence. The trial court denied defendant's motion on May 9, 2017.

On November 8, 2017, the jury found defendant guilty as charged of aggravated rape of a juvenile under thirteen years of age. Following polling of the jury, it was determined that defendant was convicted by a verdict of eleven in favor of guilty as charged and one in favor of not guilty. Because the jury did, in fact, return a non-unanimous verdict, defendant has standing to raise this challenge on appeal. *See State v. Saulny*, 16-734 (La. App. 5 Cir. 5/17/17), 220 So.3d 871, 879-80, *writ denied*, 17-1032 (La. 4/16/18), 240 So.3d 923.

At the time of the instant offense, which was alleged in the indictment to have been committed on or between August 26, 2012 and July 31, 2015, La. C.Cr.P. art. 782(A) provided, in pertinent part:

> Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.

On August 1, 2018, a proposed amendment to Article I, Section 17(A) of the Constitution of Louisiana was made to end non-unanimous jury verdicts in

---

[5] *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).

Louisiana pending approval at a statewide election. On November 6, 2018, the voters of this State approved the amendment, which took effect and became operative on January 1, 2019, requiring unanimous verdicts in all cases, but would apply only to those offenses committed on or after January 1, 2019. *See* 2018 La. Act 493, § 1. Specifically, La. C.Cr.P. art. 782(A) now provides:

> A case in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. ***A case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.*** A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

(Emphasis added).

Accordingly, because the instant offense was committed prior to January 1, 2019, defendant's verdict was properly rendered by a vote of eleven to one, and there is nothing in the jurisprudence to indicate that such a verdict, at the time, was unconstitutional.

In *Apodaca v. Oregon*, the United States Supreme Court, in a plurality decision, determined that the United States Constitution did not mandate unanimous jury verdicts in state court felony criminal trials. *State v. Bonilla*, 15-529 (La. App. 5 Cir. 2/24/16), 186 So.3d 1242, 1257, *writ denied*, 16-0567 (La. 5/2/16), 206 So.3d 881, *cert. denied*, -- U.S. --, 137 S.Ct. 239, 196 L.Ed.2d 183 (2016). The issue of non-unanimous jury verdicts rendered before the new constitutional amendment has also been addressed numerous times by the Louisiana Supreme Court, this Court, and other appellate courts in this State, and all have rejected the argument of their alleged unconstitutional nature. *See State v. Bertrand*, 08-2215 (La. 3/17/09), 6 So.3d 738, 743; *State v. Brooks*, 12-226 (La. App. 5 Cir. 10/30/12), 103 So.3d 608, 613-14, *writ denied*, 12-2478 (La. 4/19/13),

111 So. 3d 1030; *Bonilla*, *supra*; *State v. Barbour*, 09-1258 (La. App. 4 Cir. 3/24/10), 35 So.3d 1142, 1151, *writ denied*, 10-934 (La. 11/19/10), 49 So.3d 396, *cert. denied*, 562 U.S. 1217, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011); *State v. Baumberger*, 15-1056 (La. App. 3 Cir. 6/1/16), 200 So.3d 817, 832-34, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, -- U.S. -- , 138 S.Ct. 392, 199 L.Ed.2d 290 (2017); and *State v. Blueford*, 48,823 (La. App. 2 Cir. 3/5/14), 137 So.3d 54, 69, *writ denied*, 14-0745 (La. 11/21/14), 160 So.3d 968, *cert. denied*, -- U.S. -- , 135 S.Ct.1900, 191 L.Ed.2d 770 (2015).

In *Bertrand*, *supra*, the Louisiana Supreme Court reversed the trial court's holding that La. C.Cr.P. art. 782 was unconstitutional and explained the following:

> Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that non-unanimous 12-person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.

*Bertrand*, 6 So.3d at 742. The *Bertrand* court also rejected the argument that non-unanimous jury verdicts have an insidious racial component and pointed out that a majority of the United States Supreme Court also rejected that same argument in *Apodaca*. *Id.*, 6 So.3d at 742-43.

As an intermediate appellate court, this Court is obliged to follow the precedent established by the Louisiana Supreme Court. *State v. Thomas*, 10-220 (La. App. 5 Cir. 11/9/10), 54 So.3d 678, 686, *writs denied*, 10-2758 (La. 4/25/11), 62 So.3d 89 and 10-2752 (La. 5/20/11), 63 So.3d 974. Accordingly, we find that the trial judge did not err in denying defendant's motion to declare Article 782(A) unconstitutional for a crime committed prior to the amendment to La. C.Cr.P. art. 782.

**ERRORS PATENT**

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). Our review revealed one error requiring corrective action.

The record does not reflect that defendant was notified of Louisiana's sex offender registration requirements pursuant to La. R.S. 15:540 *et seq*. Defendant's conviction for aggravated rape of a juvenile under the age of thirteen (La. R.S. 14:42) is defined as a sex offense by La. R.S. 15:541(24).

La. R.S. 15:543(A) states that the trial court "shall provide written notification to any person convicted of a sex offense and a criminal offense against a victim who is a minor of the registration requirements and the notification requirements" of La. R.S. 15:542 and La. R.S. 15:542.1. In addition, La. R.S. 15:543(A) states that the trial court shall use the form contained in La. R.S. 15:543.1 to inform the defendant of the registration and notification requirements.

Here, the record indicates that the trial court did not comply with La. R.S. 15:543(A). A trial court's failure to provide this notification constitutes an error patent and warrants a remand for written notification. *State v. Lampkin*, 12-391 (La. App. 5 Cir. 5/16/13), 119 So.3d 158, 168, *writ denied*, 13-2303 (La. 5/23/14), 140 So.3d 717. This is the case even where a life sentence has been imposed. *State v. Videau*, 13-520 (La. App. 5 Cir. 12/27/13), 131 So.3d 1070, 1089, *writ denied*, 14-0212 (La. 9/12/14), 160 So.3d 965.

Accordingly, we must remand this matter to the trial court with instructions to provide written notification to defendant of the sex offender registration requirements as set forth in La. R.S. 15:542, using the form contained in La. R.S. 15:543.1.

**DECREE**

For the foregoing reasons, we affirm defendant's conviction and sentence. We also remand to the trial court with instructions to provide defendant with written notice of the sex offender notification and registration requirements, as required by La. R.S. 15:543, using the form set forth in La. R.S. 15:543.1, within ten days of this Court's opinion.

**AFFIRMED; REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

MARY E. LEGNON
INTERIM CLERK OF COURT

CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**JULY 30, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

MARY E. LEGNON
INTERIM CLERK OF COURT

# 18-KA-650

## E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE CORNELIUS E. REGAN (DISTRICT JUDGE)
MARTIN E. REGAN, JR. (APPELLANT)      TERRY M. BOUDREAUX (APPELLEE)      JULIET L. CLARK (APPELLEE)
COLIN CLARK (APPELLEE)               ANDREA F. LONG (APPELLEE)          J. TAYLOR GRAY (APPELLEE)

## MAILED

GRAHAM DAPONTE (APPELLANT)
ATTORNEY AT LAW
2125 ST. CHARLES AVENUE
NEW ORLEANS, LA 70130

HON. JEFFREY M. LANDRY (APPELLEE)
ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 NORTH 3RD STREET
6TH FLOOR, LIVINGSTON BUILDING
BATON ROUGE, LA 70802

HON. PAUL D. CONNICK, JR. (APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053